

# Supreme Court of Pennsylvania
## Court of Common Pleas
### Civil Cover Sheet

_____ County

TIME STAMP

The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.

**Commencement of Action:**
- ☒ Complaint
- ☐ Writ of Summons
- ☐ Transfer from Another Jurisdiction
- ☐ Petition
- ☐ Declaration of Taking
- ☐ Notice of Appeal

**Lead Plaintiff's Name:** Steven Burda

**Lead Defendant's Name:** Robin B. Metcalf

☒ Check here if you are a Self-Represented (Pro Se) Litigant

Name of Plaintiff/Appellant's Attorney: _____

Are money damages requested? : ☒ Yes  ☐ No

Dollar Amount Requested: (Check one)  _____ within arbitration limits  ✔ outside arbitration limits

Is this a *Class Action Suit*?  ☐ Yes  ☒ No

---

**Nature of the Case:** Place an "X" to the left of the ONE case category that most accurately describes your *PRIMARY CASE*. If you are making more than one type of claim, check the one that you consider most important.

**TORT** *(do not include Mass Tort)*
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability *(does not include mass tort)*
- ☒ Slander/Libel/ Defamation
- ☐ Other: _____

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other: _____

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional: _____

**CONTRACT** *(do not include Judgments)*
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other

- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other
- _____
- _____
- ☐ Other: _____
- _____

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure
- ☐ Partition
- ☐ Quiet Title
- ☐ Other: _____

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Zoning Board
- ☐ Statutory Appeal: Other
- _____
- _____

Judicial Appeals
- ☐ MDJ - Landlord/Tenant
- ☐ MDJ - Money Judgment
- ☐ Other: _____

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin

- ☐ Other: _____

Pa.R.C.P. 205.5

2/2010

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY,
PENNSYLVANIA

## Steven Burda

VS.                                                 NO.

## Robin B. Metcalf

### NOTICE TO DEFEND-CIVIL

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

LAWYER REFERENCE SERVICE
MONTGOMERY BAR ASSOCIATION
100 West Airy Street (REAR)
NORRISTOWN, PA 19401

(610) 279-9660, EXTENSION 201

**IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA**
CIVIL ACTION - LAW

STEVEN BURDA          :
1220 Bill Smith Blvd.    *Plaintiff*    :
King of Prussia, PA 19406    :
vs.                   :                    11-25538
                      :
                      :
ROBIN B. METCALF      :
          *Defendant*    :          **INITIAL COMPLAINT**
                      :          **JURY TRIAL DEMANDED**

PLAINTIFF'S COMPLAINTS OF (I) DEFAMATION AND FALSE LIGHT
(II) INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS,
(III) NEGLIGENCE, (IV) FRAUD BY CONCEALMENT AND MISREPRESENTATION FOR
FINANCIAL GAIN, (V) FRAUD BY DECEPTION, (VI) CONSPIRACY, (VII) FAILURE TO
KEEP AND DISCLOSE PROPER RECORDS, (VIII) ALTERATION OF MATERIAL
RECORDS, (IX) FAILURE TO DISCLOSE CONFLICT OF INTEREST, (X) FALSE
EVIDENCE AND PERJURY UNDER OATH, (XI) MISCONDUCT WITH MALICIOUS
INTENT, (XII) BREACH OF THE STANDARD OF CONDUCT AND FALLING BELOW A
STANDARD OF CARE, (XIII) INVASION OF PRIVACY BEYOND PROFESSIONAL AND
REASONABLE SCOPE, (XIV) NEGLIGENT INFLICTION OF ECONOMIC LOSS

AND NOW comes Steven Burda, Plaintiff in the above-captioned matter, and files the following Petition in good faith, complaining of Counts I through XIV.

## PARTIES, JURISDICTION AND BACKGROUND:

1.  Petitioner, Steven Burda, is the Plaintiff in the above-captioned legal action. Petitioner is an adult individual, and has been a legal citizen and resident of Montgomery County, Pennsylvania continuously and exclusively since 2007 to present.

2.  Respondent, Robin B. Metcalf, is the Defendant in the above-captioned legal action, with unknown residence address, but known work address. Ms. Metcalf is President of The Choice Group, located at 4807 Radford Avenue, Suite 106, Richmond, Virginia, 23230.

3.  The Defendant was known to the Plaintiff as the "marriage counselor" and in that capacity only.



2011-25538-0000
9 12 2011 10:43:20 AM
Complaint Civil Action
Receipt = 2011-9-02065    Fee    $251.00
Mark Levy - Montgomery County Prothonotary



4. The Plaintiff and the Defendant had a professional relationship, along with Plaintiff's now estranged wife Alla Burda, at one time in 2010 as the result of Plaintiff's marital situation.

5. The jurisdiction of this matter is proper and convenient in this Court is because the incident's events, acts and resulting damages complained herein occurred in and within Montgomery County, Pennsylvania.

6. This Court has personal jurisdiction over Plaintiff and/or Defendant.

7. The Defendant testified as a "witness" who was brought in to Montgomery County Court, and financially compensated by Alla Burda, Plaintiff's estranged wife, in a matter relating to custody of couple's child, in which proceedings were commenced by Steven Burda on March 30, 2010.

8. Full and certified transcripts from the Court exist for this date of May 11, 2011.

9. Subject matter (such as defamation of character and other counts within this complaint) jurisdiction and venue are appropriate in this Court.

10. The claims stem primarily from the event that occurred and otherwise unfolded on Wednesday, May 11, 2011, and directly and indirectly continue to unfold to the very present.

11. Plaintiff asserts that Defendant's defamatory actions, perilous behaviors, unproven testimony, improper and unlawful attacks has caused and are presently causing significant harm and injury to Plaintiff's character, his reputation, and that has resulted in personal family and financial loss, amongst other adverse affects for the Plaintiff, and directly attributed to the Defendant.

12. Plaintiff further believes that Defendant may continue to act, or otherwise participate or be part of a strategy to cause additional harm to the Plaintiff or his child(ren) in the future.

## COUNT (I) : DEFAMATION AND FALSE LIGHT

13. Plaintiff asserts that Defendant, Robin B. Metcalf, intentionally and without regard has defamed both through libel and slander Mr. Burda's character, personal and professional reputation and good name.

14. Plaintiff asserts that Defendant publicly proclaimed, through her testimony under Oath, on May 11, 2011 in Montgomery County Court of Common Pleas, Pennsylvania on a Custody matter that Mr. Burda, *inter alia*, "can be a badger a person." Then Ms. Metcalf went on to say, "And many times he [*Steven*] would badger Alla regarding moving or living with him or visitation or just any and all issues around the marriage and the children." (pg. 187-188 *of seq*. 2010-26928-

2

195) and is attached as Exhibit A, and then again, "…he [*Steven*] began to **badger** Alla." ." (pg. 192 *of seq.* 2010-26928-195)

15. Plaintiff believes that the word "badger" was used multiple times, deliberately and with malice, to inflict as much harm and injury as possible, both on the record, for the Judge to hear and take judicial note of, as well as for the family members, friends, neighbors, colleagues and other members of the public audience who had never seen or experienced Mr. Burda as a "*badger*" before in their own relationship capacity with Plaintiff over years and decades of interactions.

16. Neither specific or concrete examples, incidents nor scenarios were ever presented, given, written or oral, to support the unnecessary use of the world "badger" multiple times in the description of Mr. Burda's character.

17. Apparently, this seems to be based solely on Mrs. Alla Burda's opinions or unilaterally separate conversations and individual sessions, as many as 23 of them with Ms. Metcalf and Mrs. Burda, which ironically, was never mentioned or discussed during the testimony and unknown to any of the present individuals, at that time.

18. Further, to add more insult to the injury, Ms. Metcalf answered with "*I think a potential could be there.*" in answering a question from Steven's family law attorney, which was "*Did you have any concerns with regards to domestic abuse?*" (pg. 200 *of seq.* 2010-26928-195, Exhibit A) where previously, on the record under Oath, the family law attorney's asked: "Was there any discussion with regards to domestic violence; any physical abuse?" the answer Ms. Metcalf gave was "No. " (pg. 199-200 *of seq.* 2010-26928-195).  When family law attorney's question was to Ms. Metcalf: "you have no proof or evidence that there was ever any time of abuse?" the reply was "No." (pg. 200 *of seq.* 2010-26928-195).

19. Plaintiff is steadfast that his demeanor and interactions at the marriage counseling sessions were rational, calm and respectful to both the estranged wife and Ms. Metcalf, and allegation of "badgering" were completely untrue and no supportive documents or examples ever exist to support such strong word usage.  Mr. Burda will rigorously defend his reputation at the time of the hearing.

20. As the result of Defendant's unsupported testimony, Mr. Burda continues to be under continuous scrutiny and distrust, was placed into a position of false light and his relationship with the Judge, in legal custody capacity, as well as the personal and professional relationship with the family members, friends, neighbors, colleagues and other members of the public audience is irrefutably and wrongfully changed, in negative aspect.

3

21. Plaintiff believes that Defendant made other numerous "lies" and "omissions," misleading statements and knowingly made false arguments with the intent (or to the effect) of undermining Plaintiff's credibility by attacking his character and reputation.

22. The substantially false and malicious statements made by the Defendant had the effect of defaming Plaintiff's character and wrongly undermining Plaintiff's previous statements and credibility.

23. Plaintiff asserts that Defendant made public statements and/or committed acts that resulted in defamation of character, and caused direct and indirect harm and injury to Plaintiff, resulting in damages.

24. Plaintiff believes that Defendant's statements, in part or whole, called into question Mr. Burda's honesty, integrity, professional competence, sanity, solvency, morality and/or social refinement.

25. Plaintiff asserts that Defendant acted with an "evil mind" as defined in the law relating to punitive damages, and with reckless disregard for the rights to the Plaintiff.

26. Additionally, the Plaintiff reserves the right to add supplemental and/or material information, evidence, and/or other facts in subsequent pleadings, prior to or at the hearing/trial which was not mentioned in this Count of the Complaint.

## (II) INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

27. Plaintiff incorporates herein by reference each and every allegation of above paragraphs as through set forth in full herein verbatim.

28. Plaintiff asserts that Defendant, Robin B. Metcalf, repeatedly and over a period of time, engaged in intentional conduct that was outrageous; which was considered beyond the bounds of decency by any reasonable person, and by many of the Mr. Burda's family members, friends, neighbors, colleagues and other public individual who witnessed it.

29. Plaintiff asserts that Defendant was aware that her actions and repeated use of the world "badger," among other false statements, would result in causing emotional distress for the Plaintiff and his family. (For example, the Judge specifically referenced Ms. Metcalf's use of the word "badger" or "badgering" in her decision of not awarding custody to Mr. Burda).

30. Defendant was aware that she had other options than to cause the Plaintiff emotional distress.

31. Plaintiff asserts that Defendant had the intention of causing (or had a reckless disregard of the probability of causing) emotional distress to the Plaintiff, and acted with conscious failure to avoid injury.

32. Plaintiff did suffer severe emotional distress as the result, where Ms. Metcalf, given the litigious nature of the custody and divorce action the couple is going through, owed a legal duty to use ordinary care to prevent injury to the Plaintiff, yet the Defendant deliberately breached that duty, intentionally and with reckless disregard for the probability that severe injury would result as a result of her unethical conduct and defamatory statements.

33. Plaintiff asserts that Defendant made statements and/or committed acts that resulted in intentional infliction of emotional distress and caused harm and injury to Plaintiff resulting in damages.

34. Plaintiff was unnecessarily forced to endure pain, shock, humiliation, and feeling of disconcert, exposure and desperation, and suffered financial damages in amount to be proven at trial.

35. Plaintiff asserts that Defendant acted maliciously with an "evil mind" as defined in the law relating to punitive damages, and with reckless disregard for the rights to the Plaintiff.

36. An award of compensatory and punitive damages in a sum according to proof at trial is justified, warranted and appropriate.

37. Additionally, the Plaintiff reserves the right to add supplemental and/or material information, evidence, and/or other facts in subsequent pleadings, prior to or at the hearing/trial which was not mentioned in this Count of the Complaint.

## (III) NEGLIGENCE

38. Plaintiff incorporates herein by reference each and every allegation of above paragraphs as through set forth in full herein verbatim.

39. Plaintiff asserts that Defendant, Robin B. Metcalf, has repeatedly acted with negligence in giving her testimony with unsupportive and false information/testimony.

40. Plaintiff believed that Ms. Metcalf was negligent, and her negligent conduct was the cause of Mr. Burda's injuries, and as a result, not being awarded with primary or shared custody of child upon the conclusion of the hearing on that same day, on May 11, 2011.

41. Plaintiff believes, and will prove at the time of trial that he would have prevailed on the custody case if Ms. Metcalf was not negligent in giving her testimony.

5

42. Plaintiff asserts that Defendant had acted negligently, and it is believed that she premeditated to do so by providing inaccurate testimony to convey a disastrously false impression of Mr. Burda to the Judge, and to family members, friends, neighbors, colleagues and other members of the public audience.

43. Plaintiff asserts that Defendant acted with failure to care, as a reasonable person in the same situation would have taken precautions to prevent the events which ensued.

44. An award of compensatory and punitive damages in a sum according to proof at trial is justified, warranted and appropriate.

45. Additionally, the Plaintiff reserves the right to add supplemental and/or material information, evidence, and/or other facts in subsequent pleadings, prior to or at the hearing/trial which was not mentioned in this Count of the Complaint.

## (IV) FRAUD BY CONCEALMENT AND MISREPRESENTATION FOR FINANCIAL GAIN

46. Plaintiff incorporates herein by reference each and every allegation of above paragraphs as through set forth in full herein verbatim.

47. Plaintiff asserts that Defendant; Robin B. Metcalf, testified that she was only the "marriage counselor" of the parties in the Spring-Summer of 2010 and had fully and knowingly concealed the fact that she also was Alla's personal and individual counselor, from October 2010 to June 2011, on at least twenty-three (23) occasions, in a span of seven months. (See Exhibit B).

48. Had the Plaintiff, or Plaintiff's attorney, or Judge Carluccio known of this concealment and misrepresentation, Plaintiff believes additional questions, and would undeniably required additional evidence, and would change the course and dynamics of this witness on the stand, as the situation was a conflict-of-interest of the witness towards the parties and Court testimony.

49. Plaintiff believes that the reason that this material and considerably significant facts were concealed of Ms. Metcalf's relationship with Mrs. Alla Burda misrepresented at the hearing on May 11, 2011 was for reasons of avoiding that "conflict of interest" that would probably disqualify Defendant from testimony, or otherwise prohibit admission into trial.

50. Plaintiff believes the Defendant had financial interest with being a witness for Mrs. Burda, as not only did Mrs. Burda pay her expenses, she also provided business for Ms. Metcalf and Ms. Metcalf's firm, The Choice Group through "individual counseling sessions" where the Defendant had benefited considerably and largely.

51. Plaintiff only became aware on August 23, 2011, more than three (3) months after the conclusion of May 11, 2011 hearing that Defendant had a consequently inappropriate and conflicting connection to Alla, through individual counseling sessions, with following dates:

    a. *October 8, 2010* – this was concealed from all parties at hearing and kept in secret.

    b. *October 15, 2010* – this was concealed from all parties at hearing and kept in secret.

    c. *October 27, 2010* – this was concealed from all parties at hearing and kept in secret.

    d. *November 3, 2010* – this was concealed from all parties at hearing and kept in secret.

    e. *November 17, 2010* – this was concealed from all parties at hearing and kept in secret.

    f. *December 2, 2010* – this was concealed from all parties at hearing and kept in secret.

    g. *December 9, 2010* – this was concealed from all parties at hearing and kept in secret.

    h. *December 27, 2010* – this was concealed from all parties at hearing and kept in secret.

    i. *January 3, 2011* – this was concealed from all parties at hearing and kept in secret.

    j. *January 12, 2011* – this was concealed from all parties at hearing and kept in secret.

    k. *January 20, 2011* – this was concealed from all parties at hearing and kept in secret.

    l. *January 26, 2011* – this was concealed from all parties at hearing and kept in secret.

    m. *February 1, 2011* – this was concealed from all parties at hearing and kept in secret.

    n. *February 8, 2011* – this was concealed from all parties at hearing and kept in secret.

    o. *February 24, 2011* – this was concealed from all parties at hearing and kept in secret.

    p. *March 1, 2011* – this was concealed from all parties at hearing and kept in secret.

    q. *March 18, 2011* – this was concealed from all parties at hearing and kept in secret.

    r. *March 28, 2011* – this was concealed from all parties at hearing and kept in secret.

    s. *April 12, 2011* – this was concealed from all parties at hearing and kept in secret.

    t. *April 20, 2011* – this was concealed from all parties at hearing and kept in secret.

    u. *April 27, 2011* – this was concealed from all parties at hearing and kept in secret.

    v. *May 4, 2011* – this was concealed from all parties at hearing and kept in secret, even as this was just six (6) days prior to Defendant's appearance was a "witness" at the May 11, 2011 hearing in Montgomery County Courthouse in Pennsylvania.

    w. *June 1, 2011* – this was concealed from all parties at hearing and kept in secret.

52. Plaintiff believes that because Mrs. Alla Burda was "her" one-on-one "patient" who provided a financial cash flow, through insurance and personal contribution to the Defendant, from October 8, 2010, it is possible that Ms. Metcalf needed to "return the favor" by testifying for Mrs. Burda, and not be an "independent" witness she claimed at the hearing, as her role of "couple's marriage counselor."

7

53. Further, it is evident Ms. Metcalf had no problems driving at least ten (10) hours and nearly six-hundred miles (600) roundtrip for the hearing to testify on behalf of Alla, as it evident by her own testimony. (pg. 196 *of seq.* 2010-26928-195, Exhibit A)

54. Interestingly, when Mr. Burda, unaware of Ms. Metcalf's role and involvement with Alla in her capacity of individual sessions, asked the Defendant to testify for the couple, via e-mail on March 15, 2011, a reply back via e-mail was given by Ms. Metcalf on March 21, 2011, stating that *"I would be able to, but I'm not sure it would be helpful to the situation. Robin."* (Exhibit C)

55. Plaintiff asserts that financial gains for the Defendant through insurance, through Alla's and her family's contribution and financial reward were the motivating factors of Defendant's actions and false testimony attacking the Plaintiff.

56. This was also unethical and professional misconduct had occurred on Defendant's part.

57. An award of compensatory and punitive damages in a sum according to proof at trial is justified, warranted and appropriate.

58. Additionally, the Plaintiff reserves the right to add supplemental and/or material information, evidence, and/or other facts in subsequent pleadings, prior to or at the hearing/trial which was not mentioned in this Count of the Complaint.

## (V) FRAUD BY DECEPTION

59. Plaintiff incorporates herein by reference each and every allegation of above paragraphs as through set forth in full herein verbatim.

60. It is believed by the Plaintiff that the Defendant, Robin B. Metcalf, outwitted the parties, the audience and the Judge by deception in her testimony, and omitted material and significant relationship she had with Plaintiff's estranged wife.

61. It is believed by the Plaintiff that the Defendant had acted less than honest (and intentionally) with stating her relationship not only with the couple, but specifically with Alla Burda alone.

62. Defendant knew if she would tell the truth of the relationship, she would not be credible, and would probably not be afforded any future financial gains and incentives from Alla Burda or the Korenman family, Alla's parents.

63. In testimony under Oath, Defendant was asked by an attorney if she *"had appointments with Alla and Steven Burda?"* to which Ms. Metcalf replied, *"Together, yes."* As a follow up, and to

8

clarify again for the record, the attorney asked, "W*ere all of your appointments with all three of you*?" to which Ms. Metcalf replied, "*Yes.*" (pg. 181-182 *of seq*. 2010-26928-195, Exhibit A)

64. It is clear that a deceit had occurred, as at least twenty-three (23) of the "sessions" were not with the three parties testified under Oath, but were individual with Alla and Ms. Metcalf only.

65. It is believed by the Plaintiff that the Defendant had also defrauded and/or misbilled the Plaintiff's insurance company, where Plaintiff was a primary policy member, as in regards to erroneous or otherwise inappropriate billings for various "medical" services, which could have been provided, or not.

66. Plaintiff believes that this is a serious wrongdoing had occurred on Defendant's part, and could be criminally punishable by law.

67. An award of compensatory and punitive damages in a sum according to proof at trial is justified, warranted and appropriate.

68. Additionally, the Plaintiff reserves the right to add supplemental and/or material information, evidence, and/or other facts in subsequent pleadings, prior to or at the hearing/trial which was not mentioned in this Count of the Complaint.

## (VI) CONSPIRACY

69. Plaintiff incorporates herein by reference each and every allegation of above paragraphs as through set forth in full herein verbatim.

70. Plaintiff believes that Defendant, Robin B. Metcalf, had conspired or otherwise collaborated with Alla Burda, and/or her family members who are affluent in the community they resided in.

71. Plaintiff believes that the motive for the Defendant to commit acts of conspiracy was driven by financial gain, both from the Insurance Company and/or by possible contributions from Alla Burda's extended family.

72. Plaintiff believes that greed drove the Defendant's conduct and actions, with no regard for possible consequences towards the Plaintiff or his children.

73. An award of compensatory and punitive damages in a sum according to proof at trial is justified, warranted and appropriate.

74. Additionally, the Plaintiff reserves the right to add supplemental and/or material information, evidence, and/or other facts in subsequent pleadings, prior to or at the hearing/trial which was not mentioned in this Count of the Complaint.

## (VII) FAILURE TO KEEP AND DISCLOSE PROPER RECORDS

75. Plaintiff incorporates herein by reference each and every allegation of above paragraphs as through set forth in full herein verbatim.

76. Plaintiff believes that Defendant, Robin B. Metcalf, had failed to keep or disclose proper records acquired, or should have been acquired, during the "marriage counseling" or now known "individual counseling."

77. Plaintiff personally had observed continuous writing or note-taking by Robin B. Metcalf, most of which were in marital discussions praising Mr. Burda's character, his willingness to be a full time-father and a full-time husband to Alla Burda.

78. Plaintiff believes that the Defendant is being dishonest with the Court, when she answered, inter alia, that *"My method is, I usually scribble some handwritten notes when I am in session. As soon as the people leave, I just kind of do a little summary and put them on my computer and then destroy the handwritten notes."* The question was, *"So in a three-hour session, there are seven sentences to refresh your recollection as to what went on on April 24, 2010?"*

79. Clearly, to the Plaintiff's belief, a professional who was fully aware of the litigious nature of couple's custody and divorce action would not destroy such notes, unless they would later reveal something the Defendant doesn't wish or want to reveal.

80. Plaintiff believes that this is an unlawful activity had occurred on Defendant's part, and against the Code of Professional Conduct.

81. An award of compensatory and punitive damages in a sum according to proof at trial is justified, warranted and appropriate.

82. Additionally, the Plaintiff reserves the right to add supplemental and/or material information, evidence, and/or other facts in subsequent pleadings, prior to or at the hearing/trial which was not mentioned in this Count of the Complaint.

## (VIII) ALTERATION OF MATERIAL RECORDS

83. Plaintiff incorporates herein by reference each and every allegation of above paragraphs as through set forth in full herein verbatim.

84. Plaintiff believes that Defendant, Robin B. Metcalf, had altered or otherwise distorted the records or otherwise "fixed" or created the notes for the purpose of the May 11, 2011 hearing, which possibly never existed or were different at the time of the actual "marriage counseling sessions" in Spring-Summer of 2010.

85. Plaintiff believes that Defendant was driven by purpose to "win" the case for Alla Burda, in the protracted hearing in May 2011, and therefore, took upon unethical and unconventional steps and methods, where personal financial gain drove such behavior.

86. Plaintiff averts that, at a later date, he will petition this Honorable Court for full and complete discovery of all schedules, meetings, documents, notes, computer files as well as financial records and payments of Robin B. Metcalf as individual, or through her company and of her assistants.

87. Plaintiff believes that this is an unlawful activity had occurred on Defendant's part, and against the Code of Professional Conduct.

88. An award of compensatory and punitive damages in a sum according to proof at trial is justified, warranted and appropriate.

89. Additionally, the Plaintiff reserves the right to add supplemental and/or material information, evidence, and/or other facts in subsequent pleadings, prior to or at the hearing/trial which was not mentioned in this Count of the Complaint.

## (X) FALSE EVIDENCE AND PERJURY UNDER OATH

90. Plaintiff incorporates herein by reference each and every allegation of above paragraphs as through set forth in full herein verbatim.

91. Plaintiff believes that Defendant, Robin B. Metcalf, on numerous occasions before and throughout the hearing had presented forged data, which contained doctored information and/or facts, incorrectly stated dates, times and events, and all this while being under Oath in the Court of Common Pleas of Montgomery County, Pennsylvania.

92. Plaintiff believes he has enough evidence to prosecute the Defendant on this Court, with proof that contradicts Defendant's claims, to present in Court at the appropriate time.

93. By the way of limited example, Defendant fabricated and lied in her involvement and capacity with the parties, as was previously addressed in previous Count(s), and also, had supplied with factually inaccurate information about the Burda family and issues relating to 'marriage.'

11

94. An award of compensatory and punitive damages in a sum according to proof at trial is justified, warranted and appropriate.

95. Additionally, the Plaintiff reserves the right to add supplemental and/or material information, evidence, and/or other facts in subsequent pleadings, prior to or at the hearing/trial which was not mentioned in this Count of the Complaint.

## (XI) MISCONDUCT WITH MALICIOUS INTENT

96. Plaintiff incorporates herein by reference each and every allegation of above paragraphs as through set forth in full herein verbatim.

97. Plaintiff believes that Defendant, Robin B. Metcalf, had went above and beyond to "satisfy" the requirements of Alla Burda and/or her family members through unethical means of misconduct, with malicious intent.

98. Plaintiff believes that Defendant knew of her actions were malevolent in nature, but as indicated in other Count, Ms. Metcalf was possibly motivated or even blinded by financial gains, or promise of financial gains by Alla Burda or her wealthy family.

99. Plaintiff believes that Defendant had employed various tactics under disguise of "professional" in her field of work, to derail the Judge, and swing the decision in favor of Alla Burda.

100. An award of compensatory and punitive damages in a sum according to proof at trial is justified, warranted and appropriate.

101. Additionally, Plaintiff reserves the right to add supplemental and/or material information, evidence, and/or other facts in subsequent pleadings, prior to or at the hearing/trial which was not mentioned in this Count of the Complaint.

## (XII) BREACH OF THE STANDARD OF CONDUCT AND FALLING BELOW A STANDARD OF CARE

102. Plaintiff incorporates herein by reference each and every allegation of above paragraphs as through set forth in full herein verbatim.

103. Plaintiff believes that Defendant, Robin B. Metcalf, had not acted as a "neutral party" and had breached the standard of conduct and falling below a standard of care as the case had unfolded, from 2010 to 2011.

104. Plaintiff believes that Defendant had owed a fiduciary duty to the couple during the engagement

as a "marriage counselor", but it becomes evident to the Plaintiff that it was not the case, with Defendant having alternative motives at or before the hearing of May 11, 2011.

105. An award of compensatory and punitive damages in a sum according to proof at trial is justified, warranted and appropriate.

106. Additionally, Plaintiff reserves the right to add supplemental and/or material information, evidence, and/or other facts in subsequent pleadings, prior to or at the hearing/trial which was not mentioned in this Count of the Complaint.

## (XIII) INVASION OF PRIVACY BEYOND PROFESSIONAL AND REASONABLE SCOPE

107. Plaintiff incorporates herein by reference each and every allegation of above paragraphs as through set forth in full herein verbatim.

108. Plaintiff believes that Defendant, Robin B. Metcalf, in her testimony and/or in notes "prepared for the testimony" had unreasonably private information that was not shared during the "marriage counseling" by neither Mr. Burda or Mrs. Burda.

109. Plaintiff is concerned of invasion of privacy beyond professional and reasonable scope, and how had it been gathered or acquired, and why would Defendant have access to such information.

110. An award of compensatory and punitive damages in a sum according to proof at trial is justified, warranted and appropriate.

111. Additionally, Plaintiff reserves the right to add supplemental and/or material information, evidence, and/or other facts in subsequent pleadings, prior to or at the hearing/trial which was not mentioned in this Count of the Complaint.

## (XIV) NEGLIGENT INFLICTION OF ECONOMIC LOSS

112. Plaintiff incorporates herein by reference each and every allegation of above paragraphs as through set forth in full herein verbatim.

113. Plaintiff believes that Defendant, Robin B. Metcalf, had acted with such malice and with neglectful manner that, as stated previously, cause Plaintiff to experience and go through tremendous economic hardship and loss, as a direct and indirect actions of the Defendant.

114. Plaintiff believes that because of what has transpired through what was presented, testified,

and/or otherwise implied on or for May 11, 2011 hearing by the Defendant resulted in continuous litigation amongst the parties, where the Plaintiff incurred additional and actual financial loss in order to clear and protect his good name, to defend the prosecution of estranged wife's other claims against the Plaintiff.

115. Plaintiff believes that due to the egregious nature of the incidents inflicted by Ms. Metcalf, on all or partial counts in this complaint, the severe damage caused to the Plaintiff's, the relationship with his children, and his children's well being, the harm inflicted by the unethical and immoral behavior of the Defendant should be recognized in this matter.

116. An award of compensatory and punitive damages in a sum according to proof at trial is justified, warranted and appropriate.

117. Additionally, Plaintiff reserves the right to add supplemental and/or material information, evidence, and/or other facts in subsequent pleadings, prior to or at the hearing/trial which was not mentioned in this Count of the Complaint.

**WHEREFORE**, Plaintiff, Steven Burda, respectfully requests this Honorable Court to schedule a fair hearing, and after hearing all facts, evidence and/or any other supporting documents to award the following:

**Compensatory Damage** in sum of $200,000 in economic damage for the imminent loss of his home, additionally created litigation between Plaintiff's estranged wife and himself that is caused by the continued delays and expansion of the custody and divorce litigation, and **Punitive Damages** in sum of $300,000 for pain and suffering in restitution for the Plaintiff, and his children.

*Respectfully Submitted,*

Steven Burda
**Montgomery County, Pennsylvania**

14

## VERIFICATION

I, Steven Burda, verify that the statements made herein are true and correct to the best of my knowledge, information and belief. I understand that this statement is made subject to the penalties of 18 PA. C.S. Section 4904, relating to unsworn falsifications to authorities.

*Steven Burda*

**STEVEN BURDA**
**MONTGOMERY COUNTY, PENNSYLVANIA**

# Exhibit A

05/12/2011 Mailroom

1

IN THE COURT OF COMMON PLEAS IN AND FOR
THE COUNTY OF MONTGOMERY, PENNSYLVANIA
FAMILY COURT DIVISION

- - -

STEVEN BURDA                :   NO.  2010-26928

                            :

    vs.                     :

                            :

ALLA BURDA                  :


- - -

Volume II - PROTRACTED HEARING
Plaintiff's Petition to Modify Custody, Emergency
Petition for Special Relief, and Motion to
Intervene by Grandparents/Defendant's Petition to
Confirm Relocation of Ethan Burda - ORDER


Courtroom 11
Wednesday, May 11, 2011
Commencing at 9:30 a.m.

- - -

Bernadette Black Berardinelli
Official Court Reporter
Montgomery County Courthouse
Norristown, Pennsylvania
- - -


BEFORE:  THE HONORABLE CAROLYN TORNETTA CARLUCCIO, J.

- - -


COUNSEL APPEARED AS FOLLOWS:

    ANDREW C. LAIRD, ESQUIRE
        for the Plaintiff/Father

    SAUL D. LEVIT, ESQUIRE
        for the Defendant/Mother

- - -

(Alla Burda - redirect)

1

2          MR. LEVIT:  That's all I have.

3          MR. LAIRD:  Nothing further.

4          THE COURT:  Thank you.  You

5    can step down.

6              (At 12:46 p.m. the witness was

7    excused.)

8              - - -

9          THE COURT:  Can I talk in the

10   back quickly?  We will break for lunch until 2

11   o'clock.

12             - - -

13             (Discussion held off the record.)

14             - - -

15             (Luncheon recess taken from

16   12:46 p.m. to 2:00 p.m.)

17   AFTERNOON SESSION

18             (Proceedings were reconvened

19   with the Court, Andrew C. Laird, Esq., Saul D.

20   Levit, Esq., and the Parties being present.)

21             ... ROBIN METCALF, having been

22   duly sworn/affirmed, was examined and testified as

23   follows:

24         MR. LEVIT:  Your Honor, I've

25   given Mr. Laird a copy of Robin Metcalf's CV.  He

1            (Robin Metcalf - direct)

2    indicated he doesn't object to her qualifications.

3    I am offering her both as expert and fact witness.

4                    MR. LAIRD:   I am not going to

5    object.

6                    THE COURT:   Thank you.   You

7    are an expert.

8                    THE WITNESS:   Thanks.

9                    MR. LEVIT:   The only interesting

10   thing I found out, when she was at the University

11   Nevada, in Las Vegas, she tutored the basketball

12   team.

13                   THE COURT:   I bet we have a

14   story there.   That's for another time.

15                   DIRECT EXAMINATION

16   BY MR. LEVIT:

17   Q.     By way of background, how did you get

18   involved with Mr. and Mrs. Burda?  Skip all of the

19   other stuff.

20   A.     Alla called my office and scheduled an

21   appointment.

22   Q.     And when was that?

23   A.     In April of 2010.

24   Q.     You had appointments with Alla and Steven

25   Burda?

```
 1              (Robin Metcalf - direct)

 2    A.      Together, yes.

 3    Q.      Were all of the appointments with all three

 4    of you?

 5    A.      Yes.

 6    Q.      Were they all in person?

 7    A.      Yes.

 8    Q.      What were the dates of the appointments?

 9    A.      April 24th, May 8th, May 20th, June 19th,

10    July 13th, August 14th, and September 11th.

11                    MR. LAIRD:  Your Honor, I

12    would simply object.  I don't know what Ms. Metcalf

13    is reading from.

14                    THE COURT:  Do you want to...

15                    MR. LEVIT:  I suspect those

16    are her notes.

17                    THE WITNESS:  They are.

18                    MR. LEVIT:  I haven't seen

19    them either.

20                    THE WITNESS:  I have three

21    copies.  I am more than willing to provide them.

22                    THE COURT:  Why don't you

23    provide them to both counselors?

24                    MR. LAIRD:  Thank you.

25                    -  -  -
```

1                  (Robin Metcalf - direct)

2    BY MR. LEVIT:

3    Q.      You have given to Mr. Laird and me two

4    pages; is that correct?

5    A.      Correct.

6    Q.      The first page is entitled "Burda Progress

7    Notes"?

8    A.      Correct.

9    Q.      It refers to the dates April 24th -- these

10   are all 2010:  April 24, May 8th, May 20, June 19,

11   July 13, July 31, August 14, and September 11,

12   correct?

13   A.      Correct.

14   Q.      And what was your role?  What was your

15   understanding of your involvement in this matter?

16   A.      They came to me for marriage counseling to

17   see if they could reconcile.

18   Q.      And did you find Alla cooperative in the

19   process?

20   A.      Yes.

21   Q.      Did you find Steven cooperative in the

22   process?

23   A.      Yes.

24   Q.      You have the first note here from April 24,

25   2010.  It says three hours.  Is that a long

1                         (Robin Metcalf - direct)

2     session?

3     A.      Incredibly long.

4     Q.      Why were you having long sessions?

5     A.      I basically decided to go to the extra mile

6     since they were geographically quite a distance

7     apart from each other and didn't see each other

8     that frequently.  And so I just made some extra

9     concessions.

10    Q.      As a matter of fact, you met with them on

11    Saturdays?

12    A.      Uh-huh.  For the most part.

13    Q.      Can you tell us what happened at the first

14    meeting?  Do it that way.

15    A.      Basically I just got a little bit of

16    background.  And I learned they had a son that was

17    16 months old at the time.  And that after that,

18    Alla had a miscarriage, and that she was pregnant

19    again.  And at the time she was 26 weeks pregnant

20    and also had been diagnosed with a condition

21    called placenta previa.

22                        We talked a little bit

23    about family background.  They shared with me that

24    Steven had had issues with her family;

25    specifically with her father; that he felt her

1                   (Robin Metcalf - direct)

2      father was very controlling and, quote, ran the

3      show.

4                        They also shared with me

5      when they were living in King of Prussia, they

6      visited her family about once every five to six

7      weeks.

8                        They also shared that she

9      felt very, very trapped when she lived in King of

10     Prussia; that she was alone all day, every day in

11     the house.  And then Steven would come home from

12     work, basically get on the computer, and she just

13     felt trapped and isolated.

14                       And I felt that just an

15     observation of Steven was, you know, very bright,

16     very articulate, liked to make decisions with his

17     head, a rational thinker.

18                       At the very end of the

19     session they made a commitment to me to go on a

20     date that evening.

21     Q.     When was your next meeting?

22     A.     May 8th.

23     Q.     And how long was that one?

24     A.     Three and-a-half hours.

25     Q.     What do your notes say about that?

1          (Robin Metcalf - direct)

2    A.      Well, my notes are short.  But basically the

3    entire session was around the idea that Steven

4    said he was going to go to D.C.  And there were a

5    lot of issues about the move to D.C.

6    Q.      Do you recall what those issues were?

7    A.      Just about whether or not he actually had a

8    job there, where he was going to live, that kind

9    of thing.

10   Q.      And your next session?

11   A.      That was on May 20th.

12   Q.      Okay.  What happened then?

13   A.      That's when Steven said he was definitely

14   moving to D.C.  He said he would be moving there

15   in two weeks.

16   Q.      During this period of time, were the two of

17   them talking about reconciliation?

18   A.      They were trying.

19   Q.      Okay.  Did you find that Steven was sincere

20   in his discussions about reconciliation at that

21   time?

22   A.      It appeared so.

23   Q.      How about Alla?  Was she sincere in her

24   discussion about reconciliation at that time?

25   A.      I believe so.

05/12/2011 Matiroom

(Robin Metcalf - direct)

Q.    And then your next meeting was June 19th for two hours?

A.    Correct.

Q.    What happened there?

A.    Well, then we talked about Steven moving to D.C.  We talked about setting up some ground rules for family visits and visitation and that kind of thing.

Alla, at that point, wasn't comfortable with the idea of living with Steven yet, and wanted to kind of take it in small steps.

Q.    At that point, that would have been the fourth meeting.  Were these meetings -- I don't know the answer -- calm, contentious?  What was the dynamic during the meeting?

A.    Depended.  Sometimes it was calm, and sometimes very contentious.

Q.    When it was contention, would you describe whatever it is that you saw or how the contentions were being handled?

A.    Steven is a very insistent person.  And I guess the word that I would use would be he can badger a person.  And many times he would badger Alla regarding moving or living with him or

08/22/2011 16:02:5?  MacIntosh

1          (Robin Metcalf - direct)

2    visitation or just any and all issues around the

3    marriage and the children.

4    Q.      Did you try to deal with that or control it

5    or whatever the appropriate thing for a therapist

6    to do would be?

7    A.      To the best of my ability, yes.

8    Q.      Did each of them have a chance to express

9    their opinions and talk at these meetings?

10   A.      Yes.

11   Q.      So now we get to July 13.  And that was a

12   two-hour meeting.  Can you tell us what happened

13   there?

14   A.      Steven came with the lease for the property

15   that he rented in D.C.  He demanded that Alla sign

16   the lease.  And she just told him she wasn't

17   comfortable doing that because she didn't have a

18   job.  She had a brand new baby.  She didn't have

19   any money.

20   Q.      Was there discussion about their finances?

21   A.      A little bit.  I don't recall the details.

22   I just remember that she basically had no income

23   and no means or access to any money.

24   Q.      And then your next meeting, the bottom of

25   the page, goes over to the top of the next one,

03/12/2011 Mailroom

(Robin Metcalf - direct)

1
2      July 31, 2010, for two hours, tell us what happened
3      there.
4      A.     At that point, that was when Alla said she
5      felt Steven had been telling her a lot of lies.
6      And she just said she was fed up with his lies.
7      And Steven said to Alla -- she did not sign the
8      lease.  He just said it was over.  The marriage
9      was over.  The relationship was over.  And then he
10     said that even if she did move to D.C., there
11     would be no joint account.
12     Q.     I am showing you a document that's marked
13     M-1.
14     A.     (Witness reading.)
15     Q.     Have you seen that document before?
16     A.     I may have.  But I don't -- I don't really
17     recall ever seeing it.  They may have brought it
18     to a session, but I didn't actually read it if
19     they did.
20     Q.     Do you recall, when Steven was asking her to
21     sign the lease, there was a lease for the place for
22     the two of them?
23     A.     Well, that was still up for discussion.
24     That was part of the issue, was whether or not
25     Alla was going to move in immediately.

1          (Robin Metcalf - direct)

2                    MR. LAIRD:  I am going to

3    object, Your Honor, because I don't know the

4    relevance.  I would say this is cumulative as

5    well.  I think we already heard testimony with

6    regard to the signing of the lease, what Steven

7    wanted, what Alla wanted.

8                    THE COURT:  I don't find it

9    cumulative.  I actually find it enlightening.  I

10   think it is relevant, and I will overrule the

11   objection.

12   BY MR. LEVIT:

13   Q.    At that point in time, in July of 2010, do

14   you have an opinion as to whether Steven or Alla,

15   in effect, was terminating the idea of them

16   reconciling?

17   A.    Well, I think on -- it was July 31st when

18   Steven basically said to Alla, it's over if you

19   don't sign the lease.  Prior to then, I had really

20   believed that they were both trying to reconcile.

21   Q.    You had another session with them on August

22   14, 2010?

23   A.    That's correct.

24   Q.    Can you tell Her Honor about that one?

25   A.    When Alla came in, she was very distressed,

05/12/2011 Mailroom

                            (Robin Metcalf - direct)

1
2    because Steven had been telling everybody in

3    Philadelphia that he had filed for divorce.  And

4    so we talked about that for a little while.  And

5    then he also blocked her Facebook account and had

6    blocked her phone or put parental controls on her

7    phone.

8                         And then during that

9    session, they also had a very heated discussion,

10   disagreement about the stroller.  And I think

11   Steven wanted the stroller that Alla had.  And she

12   had already given him Ethan's stroller, and he had

13   not returned it; and that was in July.

14                         He said he wanted the

15   stroller for Annabelle.  And Alla wouldn't give it

16   to him, because he had not returned Ethan's

17   stroller.

18                         Then he said he didn't

19   return it because he paid for it.

20                         At that point Alla said:

21   Well, is that the issue?  Do you want me to pay

22   for the stroller?

23                         Then she wrote a check for

24   the amount of money that the stroller cost.

25   Q.      When she said to him:  Do you want me to pay

1    (Robin Metcalf - direct)

2    for the stroller, what did he say?

3    A.    I really don't recall.  I just know she

4    wrote a check and gave him a check.

5    Q.    Was there any discussion about whether

6    Steven had also sued Alla for the $608.97?  Do you

7    recall that?

8    A.    I don't recall that.

9    Q.    Then you had another session on September

10   11, 2010?

11   A.    Correct.

12   Q.    What happened there?

13   A.    Steven tried to serve Alla divorce papers in

14   front of me and have me witness the serving of the

15   divorce papers, which I refused to do.

16                        And then basically he began

17   to badger Alla.  And she just eventually walked

18   out of the session.

19   Q.    At that point in time did you see any hope

20   for the Burdas reconciling?

21   A.    No, sir.

22   Q.    When your note here says at the top of the

23   second page, dealing with the July 31 session, it

24   says, "Alla fed up with Steven's lies," what is

25   that about?  Do you recall?

US/11/22/2011 Mail.com

1                    (Robin Metcalf - cross)

2      A.    A lot of -- both of them are very proficient

3    technologically.   There were a lot of things about

4    Facebook and things Steven was telling people on

5    Facebook.

6                           And I believe at one point

7    in time he said he was single on Facebook and a

8    variety of other issues kind of related to

9    communication technologically.

10                          MR. LEVIT:   That's all I have,

11   Your Honor.

12                          THE COURT:   Cross-examination.

13                          MR. LAIRD:   Sure.

14                       CROSS-EXAMINATION

15   BY MR. LAIRD:

16     Q.    Hi, how are you?

17     A.    Hi.

18     Q.    Are these your complete progress notes from

19   your meetings with the Burdas?

20     A.    Yes, sir.

21     Q.    So in a three-hour session, there are seven

22   sentences to refresh your recollection as to what

23   went on on April 24, 2010?

24     A.    That's correct.   My method is, I usually

25   scribble some handwritten notes when I am in

(Robin Metcalf - cross)

session.  As soon as the people leave, I just kind

of do a little summary and put them on my computer

and then destroy the handwritten notes.

Q.     These would be what you put on the computer?

A.     Uh-huh.

Q.     Sounds like law school.

                    And then on May 8th, 2010,

you had a three and-a-half hour session.  It was

just really one sentence?  It dealt with Steven

moving to D.C. and huge issues around the problem?

A.     The entire session was about D.C. and moving

there.

Q.     On April 24th, it says Steven had issues

with her family and Dad ran the show.  Do you

recall whether Alla agreed or disagreed with that

statement?

A.     I think she tried to explain her father to

Steven.

Q.     And do you recall if that explanation

involved the father wanting the daughter to live

with him or stay with him?

A.     That may have been part of the discussion,

but I can't recall exactly.

Q.     And then Alla said she was trapped in the

15/12/2011 Matrccom

(Robin Metcalf - cross)

1

2 house in King of Prussia all alone; every week she

3 felt trapped.  Did she explain to you why she felt

4 trapped?

5 A.    She was there alone all day, with a young

6 child, and also had a miscarriage.  And she said

7 Steven would work long hours, and then come home

8 and get on the computer.

9 Q.    Did she ever say she tried to get out during

10 the day, do Mommy and Me or any type of programs?

11 A.    I don't recall.

12 Q.    On May 8th, 2010:  Steven may move to D.C.,

13 huge issues around potential move.  Do you recall

14 what those huge issues were?

15 A.    Just whether or not he did or did not have a

16 job, where he was going to live, how much rent

17 they could afford.

18 Q.    Do you understand the reason for Steven

19 moving from Pennsylvania to Washington, D.C.?

20 A.    I believe that Steven said that he wanted to

21 move to D.C. to try to be closer to Alla and the

22 kids.

23 Q.    And you know that Alla moved from King of

24 Prussia, Pennsylvania, to Richmond, Virginia, on

25 March 30th, 2010?

03/12/2011 Mailroom

1                    (Robin Metcalf - cross)

2    A.      Correct.

3    Q.      Obviously you're aware that that is some

4    distance between Pennsylvania and Richmond,

5    Virginia?

6    A.      I am very aware.

7    Q.      Obviously.  You drove it today?

8    A.      My family lives here, and I am from here.

9    So I am more than aware.

10   Q.      Out of curiosity, how long did it take you

11   to get here?

12   A.      Five hours.

13   Q.      Okay.  Do you recall if any of the issues

14   with regards to Steven moving had to do with Steven

15   wanting to be more involved with his family?

16   A.      That's what he stated.

17   Q.      July 19th, about a month later, you guys

18   discussed rules for a potential move to D.C., how

19   to handle visitation, et cetera.  Were there any

20   problems or concerns with regard to Steven visiting

21   Ethan at Alla's parents' house?

22   A.      There was a lot of discussion around that.

23   And it was, I believe, decided that he would not

24   visit Ethan at their house.

25   Q.      Was there any particular reason he wouldn't

(Robin Metcalf - cross)

2   visit at their house?

3   A.   I think he preferred not to.  He didn't

4   really want to interact with Alla.

5   Q.   And did Alla support not interacting with

6   her father?

7   A.   Yes.

8   Q.   Then there came a time Steven demanded Alla

9   sign a lease and Alla indicated she wasn't

10  comfortable in doing so?

11                      With regards to the lease,

12  did you see a copy of the lease?

13  A.   It was kind of being waived around in front

14  of me, but I didn't really see it.

15  Q.   Now, I've got to be honest with you, when

16  you're talking about signing a lease and not

17  signing a lease, and Alla being fed up and Alla

18  talking about a stroller, there seems to be a lot

19  of movement in the room.  Were they sitting at a

20  table, standing over each other?

21  A.   Chairs.  I have in my office a couch and two

22  end tables.  Across from that are two chairs and a

23  table in between.

24                      And most of the time I

25  believe they both sat in the chairs.

(Robin Metcalf - cross)

Q.    They both had kind of equal positions within the room?

A.    Absolutely.

Q.    Were you engaged solely for the purposes of helping to assist in the reconciliation of the marriage?

A.    That's typically what marriage counseling is.  Yes.

Q.    Thank you.

My point is:  You weren't involved in assisting the parties with what was in the best interest of the child with regard to visitation?

A.    Well, marriage counseling is inherently marriage and family counseling.  It is.  Children always come up in marriage counseling sessions. It just is part of the field of marriage counseling.

Q.    Part of the field but not the main focus?

A.    Correct.

Q.    Now, you indicated Steven was a rational thinker?

A.    Yes.

Q.    Would you say Alla was a rational thinker as well?

```
1                      (Robin Metcalf - cross)
2      A.      Yes.  I think Alla probably operates a
3      little bit more from an emotional perspective.
4      You know, I am looking at this from something
5      called the Myers-Briggs Type.
6      Q.      Sure.
7                              Is it fair to say they both
8      have strong personalities?
9      A.      Absolutely.
10     Q.      Would you say that one was weaker than the
11     other?
12     A.      Probably, yes.
13     Q.      Am I assuming that would be Alla?
14     A.      Correct.
15     Q.      Did Alla discuss why she moved from
16     Pennsylvania to Richmond, Virginia?
17     A.      Again, it was about being very, very
18     isolated and feeling trapped, and really feeling
19     like she didn't have a life.
20     Q.      Is it fair to say it is your understanding
21     she moved from Pennsylvania to Richmond to be with
22     her family?
23     A.      And I think to have support.
24     Q.      Was there any discussion with regards to
25     domestic violence; any physical abuse?
```

12/12/2011 Mailroom

1                    (Robin Metcalf - cross)

2    A.     No.

3    Q.     Were there any concerns that you had with

4    regards to physical abuse?

5    A.     I had some concerns.

6    Q.     Did Alla at any point in time mention any-

7    thing specific with regards to domestic violence?

8    A.     I don't believe so.

9    Q.     Did you have any concerns with regards to

10   domestic abuse?

11   A.     I think the potential could be there.

12   Q.     You say "potential", but you have no proof

13   or evidence that there was ever any type of abuse?

14   A.     No.

15   Q.     When you say "badger," can you define "badger"

16   for me?

17   A.     You know, the word "badger" and the word

18   "harass," they're the kinds of things that you

19   know it when you see it.

20                             When somebody makes a

21   point, and they continue to make the point, and

22   then they make it again and again and again and

23   again, and they get louder and louder and louder,

24   then you know somebody is being badgered.

25   Q.     You've met my wife?

1            (Robin Metcalf - redirect)

2    A.    No, I haven't.

3    Q.    Were there any concerns with either party

4    not following through?

5    A.    There were on occasions times when Steven

6    would not follow through with things he had

7    promised.  There were certain times he was

8    supposed to come for visitation and didn't come.

9    Q.    Did you understand that he was travelling

10   from Pennsylvania to Richmond, Virginia, the same

11   drive you did today?

12   A.    Absolutely.

13            MR. LAIRD:  I don't have any

14   further questions, Your Honor.

15            THE COURT:  Any redirect?

16            MR. LEVIT:  Yes, Your Honor.

17            REDIRECT EXAMINATION

18   BY MR. LEVIT:

19   Q.    At some point in time before your sessions

20   ended, Steven did move to Washington, correct?

21   A.    Correct.

22   Q.    Some of the trips he was making to Virginia

23   were from Washington to Richmond, correct?

24   A.    Correct.

25   Q.    And even then, sometimes he didn't show up

1                    (Robin Metcalf - recross)

2    when he was supposed to?

3    A.      That's correct.

4.   Q.      You were also asked if you had a concern

5    about abuse, and you said yes, and the potential

6    for abuse.  I would like to follow up.  What do you

7    mean by that?  What is your concern?

8    A.      There are just times that Steven would get

9    what I would classify as out of control, very,

10   very heated.  And a lot of times within a

11   relationship, that can escalate.

12                        MR. LEVIT:  That's all I have.

13                        MR. LAIRD:  Real quick.

14                    RECROSS-EXAMINATION

15   BY MR. LAIRD:

16   Q.      A lot of times it could escalate, but it

17   doesn't always?

18   A.      Not necessarily.  But when a couple is young

19   and the more pressure they have on them, the more

20   likely it is to escalate.

21                        MR. LAIRD:  No further questions

22                        MR. LEVIT:  Thank you.

23                        THE COURT:  Okay.  Thank you

24   so much.

25                        (At 2:43 p.m., the proceedings

1                          (Burda  v.  Burda)

2                          C E R T I F I C A T E

3

4                    I HEREBY CERTIFY that the proceedings

5        and evidence are contained fully and accurately in

6        the notes taken by me in the above cause and that

7        this copy is a correct transcript of the same.

8

9

10

11                          BERNADETTE BLACK BERARDINELLI,
                            Official Court Reporter
12                          July 1, 2011

13                                  -  -  -

14

15

16

17

18

19

20

21

22

23

24

25

10/12/2011 Mailroom

# Exhibit B



# THE CHOICE GROUP

August 23, 2011

To Whom It May Concern:

This letter serves to confirm that Alla Burda attended counseling sessions with
Robin Metcalf, M.Ed., MS, CRC, NCC, CCM, CRP, LPC on the following dates:

| | | |
|---|---|---|
| June 1, 2011 | March 1, 2011 | December 27, 2010 |
| May 4, 2011 | February 24, 2011 | December 9, 2010 |
| April 27, 2011 | February 8, 2011 | December 2, 2010 |
| April 20, 2011 | February 1, 2011 | November 17, 2010 |
| April 12, 2011 | January 26, 2011 | November 3, 2010 |
| March 28, 2011 | January 20, 2011 | October 27, 2010 |
| March 18, 2011 | January 12, 2011 | October 15, 2010 |
| | January 3, 2011 | October 8, 2010 |

Sincerely,

Robin B. Metcalf,
President

4807 Radford Avenue, Suite 106  •  Richmond, VA 23230
Telephone: (804) 278-9151  •  Fax: (804) 278-0221  •  Toll Free: (877) 374-5312

CAREER & COUNSELING SERVICES



# THE CHOICE GROUP

April 21, 2011

To Whom It May Concern:

This letter serves to confirm that both Steven Burda and Alla Burda attended marriage counseling sessions with Robin Metcalf, M.Ed., MS, CRC, NCC, CCM, CRP, LPC. Please note the correct dates attended are as follows:  04/24/10, 05/08/10, 05/20/10, 06/19/10, 07/13/10, 07/31/10, 08/14/10, and 09/11/10.

Sincerely,

Robin B. Metcalf
President

4807 Radford Avenue, Suite 106 • Richmond, VA 23230
Telephone: (804) 278-9151 • Fax: (804) 278-9224 • Toll Free: (877) 374-5312

CAREER & COUNSELING SERVICES

09/12/2011 Mailroom



# THE CHOICE GROUP

April 21, 2011

*Mailed TDS, Burda 2/22/11 copy to burda 1/21/6.*

To Whom It May Concern:

This letter serves to confirm that both Steven Burda and Alla Burda attended marriage counseling sessions with Robin Metcalf, M.Ed., MS, CRC, NCC, CCM, CRP, LPC. The dates attended: 03/08/10, 04/24/10, 05/20/10, 06/19/10, 07/13/10, 07/31/10, 08/14/10, and 09/11/10.

Sincerely,

Robin B. Metcalf
President

4807 Radford Avenue, Suite 106 • Richmond, VA 23230
Telephone: (804) 278-9151 • Fax: (804) 278-9221 • Toll Free: (877) 374-5313

CAREER & COUNSELING SERVICES

# Exhibit C



Steven Burda <steven.burda.mba@gmail.com>

# Robin Metcalf / for 3-23-2011 at 1:30pm?

**Robin Metcalf <Robin.Metcalf@thechoicegroup.com>**                    Mon, Mar 21, 2011 at 9:00 AM
To: Steven Burda <steven.burda.mba@gmail.com>

I would be able to, but I'm not sure it would be helpful to the situation.

Robin

---

**From:** Steven Burda [mailto:steven.burda.mba@gmail.com]
**Sent:** Tuesday, March 15, 2011 8:16 PM
**To:** Robin Metcalf
**Cc:** Steven Burda
**Subject:** Robin Metcalf / for 3-23-2011 at 1:30pm?

Robin Metcalf, M.Ed., MS, CRC, NCC, CCM, CRP, LPC
e-mail: Robin.Metcalf@thechoicegroup.com
toll free phone: 877-374-5312   fax: 804-278-9221
bio/company: http://www.thechoicegroup.com/bios/bio_rmetcalf.htm

Hello Robin -
This is Steven Burda from PA.  As you recall, we (Alla and I) were at several sessions for marriage counseling with you in 2010, from April to September.  We now have a short custody/visitation hearing on Wednesday, 3/23/10, at 1:30PM, at the Henrico County Juvenile Domestic Court with Judge Soden, and I wanted to see if you would be able to come and give a brief statement of your professional experience and interaction with us, as a couple, and your own observations during those sessions.  Would you be able to do so, without a subpoena?  It would be greatly appreciated, and I thank you in advance.
- Steven Burda

Case# 2011-25538-2 Received at Montgomery County Prothonotary on 09/18/2011 9:58 PM, Fee = $0.00

## IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA
### CIVIL ACTION - LAW

| | | |
|---|---|---|
| **STEVEN BURDA** | : | |
| *Plaintiff* | : | |
| **vs.** | : | DOCKET # **2011-25538** |
| | : | |
| **ROBIN B. METCALF** | : | |
| *Defendant* | : | CIVIL COMPLAINT |
| | : | |

## CERTIFICATE OF SERVICE

I, Steven Burda, do hereby certify that a true and correct time-stamped copy of initial **Complaint Civil Action**, filed/commenced on **09/12/2011**, has been served upon the following:

ROBIN B. METCALF
4807 RADFORD AVE., SUITE 106
RICHMOND, VA 23230
FAX: (804) 278-9221
E-MAIL: robin.metcalf@thechoicegroup.com

Via: **E-mail and Fax** on **09/16/2011**

Date Certificate of Service Filed: 9/18/2011     By: *Steven Burda*
STEVEN BURDA